Filed 2/6/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| IBC BUSINESS OWNERS FOR SENSIBLE DEVELOPMENT,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CITY OF IRVINE,<br><br>    Defendant and Appellant;<br><br>GEMDALE 2400 BARRANCA HOLDINGS, LLC,<br><br>    Real Party in Interest and Appellant. | G060850<br><br>(Super. Ct. No. 30-2020-01155214)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Kirk H. Nakamura, Judge. Affirmed.

Rutan & Tucker, Jeffrey T. Melching, Peter J. Howell and Travis Van Ligten for Defendant and Appellant City of Irvine.

Cox, Castle & Nicholson, Tim Paone, Andrew B. Sabey and James M. Purvis for Real Party in Interest and Appellant Gemdale 2400 Barranca Holdings, LLC.

Connor, Fletcher & Hedenkamp, Edmond M. Connor, Matthew J. Fletcher and Douglas A. Hedenkamp for Plaintiff and Respondent.

\*         \*         \*

The Irvine Business Complex (the IBC) covers roughly 2,800 acres in defendant City of Irvine (the City). In 2010, the City adopted a plan to guide development of the IBC. It also prepared and approved a program environmental impact report (the 2010 PEIR) that studied the effects of the development plan under the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.).[1] Several years later, real party in interest and appellant Gemdale 2400 Barranca Holdings, LLC (Gemdale), submitted a plan to redevelop a 4.95-acre parcel in the IBC. It sought to replace the existing two story, 69,780-square-foot building with a 275,000-square-foot office complex, consisting of five- and six-story office buildings and a seven-story parking structure. The City determined all the environmental effects of the proposed project had been studied in the 2010 PEIR, and it found the project would have no further significant environmental effects. It approved the project over the objections of Hale Holdings, LLC (Hale Holdings), the managing member of plaintiff IBC Business Owners for Sensible Development (petitioner). Petitioner then filed a petition for writ of mandate. The trial court granted the writ and entered judgment in favor of petitioner.

The City and Gemdale appeal the judgment, arguing the City correctly approved the project. First, they contend the City correctly found all the project's environmental effects were within the scope of the 2010 PEIR. Second, they assert the project was exempt from environmental review. We disagree with both contentions. As to the first argument, there is insufficient evidence showing the project's greenhouse gas emissions are within the scope of the 2010 PEIR. Nor have its emissions been shown to be less than significant under any other standard. As to the second, no exemption applies because the project involves unusual circumstances which may cause significant environmental effects. As such, we affirm the judgment.

---

[1] We abbreviate the general phrase "environmental impact report" in this opinion as "EIR," while we refer to the specific program EIR at issue as the "2010 PEIR."

2

I

FACTS

*A. The IBC*

The IBC is in the western portion of the City. It covers about 2,800 acres of land, bounded by John Wayne Airport to the northwest, the San Diego Creek to the southeast, Barranca Parkway to the northeast, and Campus Drive to the southwest. It was developed in the 1970s as a regional economic and employment base. Currently, most of the land in the IBC is designated for office uses, with substantial amounts of industrial and warehouse uses, as well as scattered residential uses (mostly mid-to high-rise condominiums).

In 2010, the City adopted the IBC Vision Plan and Mixed Used Overlay Zoning Code Planning Process (the Vision Plan) as an amendment to the City's General Plan. The Vision Plan established a development guide for the IBC, with the overall goal of creating a mixed-used community with urban neighborhoods. In particular, the Vision Plan sought to allow for more urban residential development to address increased housing demand in the IBC.

The City concurrently prepared the 2010 PEIR to study the Vision Plan's environmental effects. The 2010 PEIR sought to "examine[] the total scope of environmental effects that would occur as a result of buildout of the entire [Vision Plan]." And this examination was intended to "provide a full disclosure of the environmental impacts that may occur throughout the [IBC], together with an analysis of the site specific and cumulative environmental impacts that [would] occur throughout the buildout of the [Vision Plan]."

The 2010 PEIR was expressly designed to provide environmental clearance for future site-specific development projects within the IBC. It detailed how review of such projects would proceed: "[i]f determined necessary, an initial study [would] be prepared by the [relevant] agency . . . for each future development application within the

3

IBC to ascertain whether a Subsequent EIR, Supplemental EIR, or other environmental documentation [was] necessary to comply with the CEQA . . . ." If the responsible agency found "no new [environmental] effects could occur and no new mitigation measures would be required for the subsequent [project], it [could] approve the subsequent [project] without preparing additional environmental documentation."

Under the Vision Plan, development in the IBC is limited to 17,038 total residential units and 48,787,662 square feet of nonresidential development at full buildout, which was planned to occur post-2030. To stay within this cap, each parcel in the IBC is assigned a development budget which is referred to as a development intensity value (DIV). The maximum development intensity allocations for each site are expressed in AM and PM peak hours and average daily automobile DIV. A database is maintained to track the DIV allocated to each parcel.

Within the IBC, a parcel may transfer a portion of its DIV budget to another parcel, subject to City approval. These transfers of development rights (TDRs) allow "unused DIV budget allocations . . . [to] be moved from one site to another without increasing the overall development intensity budget of the IBC." TDR applications are only approved by the City if the project will not adversely affect infrastructure and City services and will not cause "adverse impact on the surrounding [traffic] circulation system."

The 2010 PEIR's analysis was based on several land use assumptions for development of the IBC under the Vision Plan. These assumptions were divided into (1) existing conditions, (2) assumptions for 2015, which consisted of ongoing projects plus unbuilt approved projects, and (3) assumptions for post-2030, which consisted of future proposed projects. For the post-2030 assumptions, certain sites were deemed likely to be redeveloped. Conversely, other sites were identified as unlikely to be redeveloped and assumed to be "fixed." The 2010 PEIR also divided the IBC into roughly 150 Traffic Analysis Zones (zones), numbered as zones 395 to 546. A post-2030

4

land use mix was developed for each zone. And the 2010 PEIR analyzed environmental impacts based on the anticipated development to occur within each zone. The 2010 PEIR only assumed TDRs for projects that had applications pending at the time it was prepared.

As to these assumptions, though, the 2010 PEIR stated, "[i]t is anticipated that actual specific future development *may occur differently than that anticipated in the assumptions* used for the Vision Plan land use model, which is why a specific land use plan is not proposed as part of the Vision Plan project. Projects not consistent with the Vision Plan land use model assumptions will be reviewed in accordance with existing city polices and traffic study procedures to determine whether additional conditions of approval or environmental review are necessary." (Italics added.) It also clarified that "[w]hile some sites with excess intensity have been classified as 'fixed' for purposes of the land use assumptions, *intensity transfers from these sites are not precluded in the future.* Additional traffic analysis would be necessary should such a transfer be proposed." (Italics added.)

As to TDRs, the 2010 PEIR explained, "[t]he City developed a set of reasonable assumptions concerning future TDRs and applied those assumptions in the traffic analysis. . . . However, if and to the extent the assumptions utilized by the City . . . prove incorrect, then an analysis of the impact of the differences between current assumptions and future realities will have to be conducted in a manner consistent with CEQA and the CEQA Guidelines [(Cal. Code Regs., tit. 14, §§ 15000-15387)]."

The 2010 PEIR determined most of the environmental impacts of the Vision Plan would either be insignificant or could be mitigated to a level below significance. But it found the "[i]mpacts related to Air Quality, Land Use Planning, Noise, and Traffic [would] remain significant despite the adoption of all feasible mitigation measures." For these significant and unavoidable impacts, the City adopted a

5

Statement of Overriding Considerations, which concluded these unavoidable adverse impacts were outweighed by the benefits of the Vision Plan.

*B. The Proposed Project*

Gemdale submitted an application for the project at issue (the Gemdale project) in July 2019.  The Gemdale project seeks to redevelop a 4.95-acre parcel in the IBC located at 2400 Barranca Parkway (the project site), which is part of zone 420.  Currently, the project site is occupied by a single two story, 69,780-square-foot office and warehouse building, and surface parking lots.  The Gemdale project would demolish the existing building and parking lots to construct a 275,000-square-foot office complex, consisting of a five-story office building, a six-story office building, and a seven-story parking structure.  Below are models of the completed Gemdale project (the white multi-story buildings) and the neighboring parcels (the grey buildings).



Proposed Project
- View One



Proposed Project
- View Two



Proposed Project
- View Three

The project site was assumed to be fixed in the 2010 PEIR. Its DIV budget was 72 AM peak-hour, 75 PM peak-hour, and 758 daily DIVs. The scale of the Gemdale project, however, required a total budget of 358 AM peak-hour, 380 PM peak-hour, and 3,787 daily DIVs. To account for this disparity, Gemdale applied for a TDR in the amount of 287 AM peak-hour, 305 PM peak-hour, and 3,043 daily DIVs, which is the equivalent of 221,014 square feet of office space. The requested TDR for the Gemdale project nearly doubled the largest approved TDR in the history of the Vision Plan, which was a transfer equivalent to 111,538 square feet of space. The site sending its development rights, 7040 Scholarship, was located on the other side of the IBC.



In reviewing the Gemdale project, the City's staff initially thought it might be exempt from CEQA. But rather than file an exemption, they decided to prepare an addendum to the 2010 PEIR (the addendum). The addendum contains an environmental checklist prepared by the City's staff to determine whether the potential environmental

effects of the Gemdale project had been analyzed in the 2010 PEIR.  Based on the checklist, the addendum concluded no further environmental review was required: "[A]lthough the [Gemdale] project could have a significant effect on the environment, . . . all potentially significant effects (a) have been analyzed adequately in [the 2010 PEIR] pursuant to applicable standards, and (b) have been avoided or mitigated pursuant to [the 2010 PEIR], including revisions or mitigation measures that are imposed upon the [Gemdale] project."

On March 5, 2020, the City's Planning Commission voted to approve the Gemdale project.  The approval was appealed by Hale Holdings, petitioner's managing member, which owns a lot adjacent to the project site.  The appeal was set to be heard by the City Council on May 26, 2020, but it was continued twice and heard on July 14, 2020.  Immediately after the hearing, the City denied the appeal and approved the Gemdale project and the related TDR request.  As part of the approval, the City found the addendum was adequate to serve as the environmental document for the project and satisfied all CEQA requirements.  In making this finding, it determined:

1. "There [were] no substantial changes to the project that [would] require major revisions to the [2010 PEIR] due to new, significant environmental effects or a substantial increase in the severity of impacts identified in the [2010 PEIR]."

2. "Substantial changes [had] not occurred in the circumstances under which the project [was] being undertaken that [would] require major revisions of the [2010 PEIR] to disclose new, significant environmental effects or a substantial increase in the severity of the impacts identified in the [2010 PEIR]."

3. There was no new material information, that was unknown at the time the 2010 PEIR was certified, showing (a) new significant effects not discussed in the 2010 PEIR, (b) a substantial increase to significant impacts determined in the 2010 PEIR, or (c) additional mitigation measures that might reduce any significant effects or impacts

9

identified in the 2010 PEIR. (See Pub. Resources Code, § 21166; Cal. Code Regs., tit. 14, § 15162, subd. (a).)[2]

Of relevance here, the City found the Gemdale project would have "no adverse impact on the surrounding circulation system." It elaborated, "[t]he Traffic Impact Analysis prepared for the project by [LSA Associates, Inc. in December 2019] included an in-depth review of the impacts of the [Gemdale] project across multiple study years including existing, short-term interim year (defined as traffic forecast three years out), long-term interim year (defined as traffic forecast 20 years out), and at General Plan build-out. . . . [It] determined that the project would not significantly impact the study area intersections or roadways, with the inclusion of project design features" that would be incorporated around the Gemdale project.

Petitioner then filed this petition for writ of mandate in the trial court, arguing the City had not complied with CEQA. The court agreed with petitioner and entered judgment in its favor. It issued a writ of mandate ordering the City to set aside approvals of the Gemdale project, the TDR, the addendum, and any finding that the Gemdale project would qualify for a CEQA exemption. The City and Gemdale appeal.

II

DISCUSSION

In CEQA suits, an appellate court reviews the agency's decision, not the trial court's ruling. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427.) As such, rather than presuming the lower

---

[2] All further undesignated statutory references are to the Public Resources Code. The CEQA Guidelines (Cal. Code Regs., tit. 14, §§ 15000-15387) will be referred to as the "Guidelines" in this opinion to distinguish between the Public Resources Code and the Code of Regulations. "Courts 'should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA.'" (*Save Our Access etc. v. Watershed Conservation Authority* (2021) 68 Cal.App.5th 8, 23.)

court's judgment is correct, we presume the City's decision is correct and give substantial deference to its findings.  The burden is on petitioner to show the City erred.  (*San Franciscans Upholding the Downtown Plan v. City & County of San Francisco* (2002) 102 Cal.App.4th 656, 674; *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 116-117.)

Regardless of who has the burden, the outcome of this appeal depends on the answers to two overarching questions.  First, are the Gemdale project's environmental effects consistent with the 2010 PEIR, *i.e.*, did the City properly rely on the addendum in approving the Gemdale project?  Second, is the Gemdale project categorically exempt from CEQA, meaning the City was not obligated to prepare the addendum or perform any environmental review?  We answer "no" to both questions.  Accordingly, we conclude the City erred in approving the addendum, the Gemdale project, and the requested TDR.

## A.  Consistency with the 2010 PEIR

We start by addressing the first primary question raised by this appeal, which is whether the Gemdale project is consistent with the 2010 PEIR.  This question involves two subissues raised by petitioner.  Generally, petitioner asserts there is insufficient evidence to support the City's finding that (1) the Gemdale project will not have significant traffic impacts, and (2) the Gemdale project's greenhouse gas emissions are within the scope of the 2010 PEIR.  We reject the former argument but agree with the latter one.

### 1.  Applicable Law

"'The foremost principle under CEQA is that the Legislature intended the act "to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language."'" (*Pocket*

11

*Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 926.) "'[T]he EIR is the "heart of CEQA."'" (*Ibid*.) Its purpose "is 'to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' [Citation.] The EIR thus works to 'inform the public and its responsible officials of the environmental consequences of their decisions before they are made,' thereby protecting "'not only the environment but also informed self-government."'" (*Friends of College of San Mateo Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937, 944.)

This case involves a program EIR, which is "'an EIR which may be prepared on a series of actions that can be characterized as one large project' and are related in specified ways. [Citation.] An advantage of using a program EIR is that it can '[a]llow the lead agency to consider broad policy alternatives and program wide mitigation measures at an early time when the agency has greater flexibility to deal with basic problems or cumulative impacts.' [Citation.] Accordingly, a *program* EIR is distinct from a *project* EIR, which is prepared for a specific project and must examine in detail site-specific considerations." (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1169.)

Program EIRs are routinely used "to avoid preparing multiple EIRs for a series of actions." (*Save Berkeley's Neighborhoods v. Regents of University of California* (2020) 51 Cal.App.5th 226, 242.) When used for this purpose, "the public agency must examine [subsequent] site-specific program activities 'in the light of the program EIR to determine whether an additional environmental document must be prepared.' [Citation.] If the site-specific activity will not create effects or require mitigation measures that were not discussed in the program EIR, the public agency is not required to prepare any other site-specific environmental document." (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 234 Cal.App.4th 214, 238.) Put differently, preparation of a

site-specific environmental document through a public process is only required if the agency discovers new impacts that were unaddressed in the program EIR. (*Ibid*.)

When determining whether later activities are within the scope of a *program* EIR, the Guidelines adopt an approach used to determine whether a *project* EIR requires a subsequent EIR. Section 15162, subdivision (a), of the Guidelines explains that once a project EIR has been certified, a subsequent EIR is not required unless there are substantial changes to the project, substantial changes to the circumstances surrounding the project, or new material information becomes available. The Guidelines use the same criteria to determine whether a later site-specific activity is consistent with a program EIR. Guidelines section 15168, subdivision (c)(2), specifies, "[i]f the agency finds that pursuant to Section 15162, no subsequent EIR would be required, [it] can approve the activity as being within the scope of the project covered by the program EIR, and no new environmental document [is] required." Guidelines section 15168, subdivision (c)(4), recommends use of a written checklist "to determine whether the environmental effects of [site-specific activities are] within the scope of the program EIR."

Agencies are instructed to prepare an addendum for minor technical changes or additions to a project that "'do not raise important new issues about the significant effects on the environment.'" (*Ventura Foothill Neighbors v. County of Ventura* (2014) 232 Cal.App.4th 429, 435.) Guidelines section 15164, subdivision (a), states the "agency shall prepare an addendum to a previously certified EIR if some changes or additions are necessary but none of the conditions described in [Guidelines] Section 15162 calling for preparation of a subsequent EIR have occurred." "An addendum need not be circulated for public review but can be included in or attached to the final EIR . . . ." (Guidelines, § 15164, subd. (c).)

Program EIRs may also utilize a process known as "tiering." (*In re Bay-Delta etc.*, *supra*, 43 Cal.4th at p. 1170.) "'Tiering' refers to using the analysis of general

13

matters contained in a broader EIR . . . with later EIRs and negative declarations on narrower projects; incorporating by reference the general discussions from the broader EIR; and concentrating the later EIR or negative declaration solely on the issues specific to the later project." (Guidelines, § 15152, subd. (a).) A "[n]egative declaration'" is "a written statement by the lead agency briefly describing the reasons that a proposed project, not exempt from CEQA, will not have a significant effect on the environment and therefore does not require the preparation of an EIR." (Guidelines, § 15371.)

Within the context of a program EIR, tiered review is only necessary if the later site-specific activity would have significant environmental effects that were not examined in the program EIR. (Guidelines, § 15168, subd. (c)(1); *Save Berkeley's Neighborhoods v. Regents of University of California*, *supra*, 51 Cal.App.5th at p. 236.) If the activity has such unexamined effects, "a new initial study [needs] to be prepared leading to either an EIR or a negative declaration. That later analysis may tier from the program EIR . . . ." (Guidelines, § 15168, subd. (c)(1).) Unlike an addendum, public review is required for a subsequent EIR or subsequent negative declaration. (Guidelines, § 15162, subd. (d).) To reiterate, though, no subsequent EIR or negative declaration is required if the later activity's environmental effects are within the scope of the program EIR. (Guidelines, § 15168, subd. (c)(2); *Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 44-45.)

2. *Standard of Review*

The parties dispute the applicable standard of review for determining whether the activity at issue, the Gemdale project, is within the scope of the 2010 PEIR. The City and Gemdale contend the substantial evidence standard applies, while petitioner argues for application of the fair argument standard. We agree with the City and Gemdale.

14

"Substantial evidence is the proper standard where, as here, an agency determines that a project consistent with a prior program EIR presents no significant, unstudied adverse effect." (*Mission Bay Alliance v. Office of Community Investment & Infrastructure* (2016) 6 Cal.App.5th 160, 174; *Santa Teresa Citizen Action Group v. City of San Jose* (2003) 114 Cal.App.4th 689, 702 ["When an agency has already prepared an EIR, its decision not to prepare [a subsequent EIR] for a later project is reviewed under the deferential substantial evidence standard"]; see Guidelines, § 15168, subd. (c)(2).) In applying this standard, "we review the administrative record of the public agency's decision . . . for substantial evidence to support that decision. [Citations.] Substantial evidence is evidence of ponderable legal significance that is reasonable in nature, credible, and of solid value. [Citation.] In applying the substantial evidence standard of review, all conflicts in the evidence are resolved in favor of the prevailing party and all legitimate and reasonable inferences are made to support the agency's decision. [Citations.] When two or more inferences reasonably can be deduced from the evidence, we cannot substitute our deductions for those of the agency." (*Holden v. City of San Diego* (2019) 43 Cal.App.5th 404, 410.)

Petitioner contends that under section 21094 we should apply the fair argument standard. This "standard of review [asks] whether, after examining the entire record, there is substantial evidence to support a fair argument that a project may have a significant effect on the environment." (*Sierra Club v. California Dept. of Forestry & Fire Protection* (2007) 150 Cal.App.4th 370, 381.) "The fair argument standard creates a low threshold favoring future environmental review and differs markedly from the deferential substantial evidence standard of review normally enjoyed by agencies." (*Citizens for a Sustainable Treasure Island v. City and County of San Francisco* (2014) 227 Cal.App.4th 1036, 1049 (*Citizens for a Sustainable Treasure Island*).)

Section 21094 concerns *tiered* environmental impact reports. "[W]hen an agency attempts to tier its environmental review for a materially different project onto a

15

prior program EIR, then the fair argument test is required under section 21094, subdivision (c)." (*Citizens for a Sustainable Treasure Island*, *supra*, 227 Cal.App.4th at p. 1050, fn. 6.) As explained above, while a program EIR may use tiering for later site-specific review, it is not required to do so. Tiering is only required if the subsequent project "would have effects that were not examined in the program EIR." (Guidelines, § 15168, subd. (c)(1).) No tiered review was performed here because the City concluded the Gemdale project's environmental effects were consistent with the 2010 PEIR. Numerous courts have rejected application of the fair argument standard when reviewing an agency's determination that an activity's environmental effects were addressed in a program EIR. (See, e.g., *Mission Bay Alliance v. Office of Community Investment & Infrastructure*, *supra*, 6 Cal.App.5th at p. 174; *Citizens for a Sustainable Treasure Island*, at pp. 1049-1050; *Citizens for Responsible Equitable Environmental Development v. City of San Diego Redevelopment Agency* (2005) 134 Cal.App.4th 598, 609-610.)

### 3. *Traffic Analysis*

Petitioner argues the City's environmental review of the Gemdale project was inadequate because it failed to perform a mandatory "vehicle miles traveled" (VMT) analysis. VMT "refers to the amount and distance of automobile travel attributable to a project." (Guidelines, § 15064.3, subd. (a).) Because no VMT analysis was conducted, petitioner claims there is insufficient evidence to support the City's finding that the Gemdale project will not have significant traffic impacts. We disagree. The City was not obligated to perform a VMT analysis for the addendum. Its traffic study for the Gemdale project used the same analytical method as the 2010 PEIR, which is sufficient to support its traffic impacts finding.

Petitioner's argument is based on Guidelines section 15064.3 (the VMT Guideline), which was adopted after the 2010 PEIR. The history of the VMT Guideline dates back to 2013, when section 21099 was enacted. Section 21099, subdivision (b)(1),

required the Office of Planning and Research to draft revisions to the Guidelines "establishing criteria for determining the significance of transportation impacts of projects," including recommended metrics for transportation impacts. "Upon certification of [these] guidelines . . . automobile delay, as described solely by level of service or similar measures of vehicular capacity or traffic congestion, shall not be considered a significant impact on the environment pursuant to this division . . . ." (§ 21099, subd. (b)(2).) Per section 21099's mandate, the VMT Guideline was adopted in December 2018. (*Citizens for Positive Growth & Preservation v. City of Sacramento* (2019) 43 Cal.App.5th 609, 625.) The VMT Guideline establishes VMT as "the most appropriate measure of transportation impacts" (Guidelines, § 15064.3, subd. (a)), and it provides criteria for conducting VMT analysis (Guidelines, § 15064.3, subd. (b)). It also specifies that "[b]eginning on July 1, 2020, the provisions of [the VMT Guideline] shall apply statewide." (Guidelines, § 15064.3, subd. (c).)

The City did not perform a VMT analysis in the 2010 PEIR or for the Gemdale project. Instead, the 2010 PEIR calculated traffic impacts using a level of service methodology, i.e., peak traffic hours and total traffic volume. The Gemdale project's traffic study utilized the same methodology. Prior to the adoption of the VMT Guideline, the level of service methodology utilized by the City had been a long-established standard. (*Tiburon Open Space Committee v. County of Marin* (2022) 78 Cal.App.5th 700, 750-751.) However, petitioner maintains that "[a]s of July 1, 2020, . . . VMT [became] the proper metric for analyzing transportation impacts, and [level of

17

service]-based traffic studies [could] no longer be used . . . ." [3]  Because the addendum's final approval occurred on July 14, 2020, after the VMT Guideline became applicable, petitioner insists the City was required to perform a VMT analysis of the Gemdale project.

Petitioner's argument is based on a section of the Guidelines that states, "[a]mendments to the guidelines apply prospectively only.  New requirements in amendments *will apply to steps in the CEQA process not yet undertaken* by the date when agencies must comply with the amendments."  (Guidelines, § 15007, subd. (b), italics added.)  Because final review of the addendum was "not yet undertaken" by July 1, 2020, petitioner asserts the City was required to comply with the VMT Guideline and perform a VMT analysis.  Addressing this argument requires us to interpret the language of Guidelines section 15007, subdivision (b), which we review de novo.  (*Save Our Carmel River v. Monterey Peninsula Water Management Dist.* (2006) 141 Cal.App.4th 677, 693-694.)  In doing so, we follow the same rules governing statutory interpretation.  We give the regulatory language its plain, commonsense meaning.  If the language of the regulation is clear and unambiguous, we need not perform any further steps.  (*Berkeley Hills Watershed Coalition v. City of Berkeley* (2019) 31 Cal.App.5th 880, 890-891.)

---

[3]  Petitioner briefly argues for an earlier compliance date for the VMT Guideline.  Guidelines section 15007, subdivision (d), states, "[p]ublic agencies shall comply with new requirements in amendments to the guidelines beginning with . . . . [¶] . . . [¶] . . . [t]he 120th day after the effective date of the guideline amendments."  Since the VMT Guideline was certified on December 28, 2018, petitioner claims the City had to comply with it by April 27, 2019.  But the VMT Guideline expressly states its terms became effective statewide on July 1, 2020.  (Guidelines, § 15064.3, subd. (c).)  A specific provision relating to a particular subject will govern over a general provision that is broad enough to cover the same subject.  (*Committee for a Progressive Gilroy v. State Water Resources Control Bd.* (1987) 192 Cal.App.3d 847, 859.)  Petitioner does not reconcile the language of the VMT Guideline with the general language of Guidelines section 15007, subdivision (d).  Thus, it has not met its burden on this point.  (*Center for Biological Diversity v. Department of Forestry & Fire Protection* (2014) 232 Cal.App.4th 931, 942.)

18

Petitioner's interpretation of Guidelines section 15007, subdivision (b), ascribes a narrow meaning to the phrase, "steps in the CEQA process." Its argument assumes final approval of the addendum is its own CEQA step, which was undertaken on July 14, 2020. But a "step" in the CEQA process covers a much broader range of activities. This is apparent from precedent, which describes CEQA as "a three-step process. In the first step, the public agency must determine whether the proposed development is a 'project,' that is, 'an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment' undertaken, supported, or approved by a public agency." (*Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 286.) If so, the agency proceeds to the second step. This requires the agency to determine whether the project is exempt from CEQA, and, if not, whether the project will have a significant effect on the environment. (*Ibid*.) If the project is not exempt and will have a significant environmental effect, "the agency must proceed to the third step, which entails preparation of an environmental impact report before approval of the project." (*Ibid*.)

Our Supreme Court's description of the steps in the CEQA process does not state whether an addendum is part of the third step, constitutes its own step, or is part of another step. But we need not decide this issue. From the above authority, it is enough to conclude that a "step[] in the CEQA process" is a broad category meant to cover an entire review procedure, for example, preparation of an EIR. Clearly, final approval of an addendum itself does not constitute its own CEQA step. At the very least, the CEQA step at issue here is the entire addendum process from start to finish, meaning we must evaluate whether that process was "undertaken" before the VMT Guideline became applicable on July 1, 2020.

It is undisputed the addendum process was completed on July 14, 2020. But undertaken and completed are not synonymous. Rather, "undertaken" is a form of the verb, "undertake," which means "to do or begin to do something, especially

19

something that will take a long time or be difficult." (Cambridge Dict. Online (2022) https://perma.cc/R2MG-2DTJ [as of Feb. 6, 2023].) Though the specific start date of the addendum process is unclear, it began well before July 1, 2020. For example, e-mail correspondence dated October 1, 2019, discusses the addendum. The City's nearly 400-page traffic study was prepared for the addendum in December 2019. Thus, the City did not have to comply with the VMT Guideline because the addendum process had already been "undertaken" by the time it became applicable.

The above interpretation is also more reasonable than petitioner's reading of Guidelines section 15007, subdivision (b). This is illustrated by this case's procedural history. Hale Holdings' appeal of the Planning Commission's approval was placed on calendar for May 26, 2020, weeks before the VMT Guideline became applicable on July 1. Based on petitioner's interpretation of the relevant Guideline, had the appeal hearing and approval occurred on May 26, the City would not have been obligated to perform a VMT analysis. But since the hearing was continued to a date after July 1, under petitioner's interpretation, the City must now perform a VMT analysis. As shown from this case, petitioner's interpretation of Guidelines section 15007, subdivision (b), leads to capricious applications of new requirements. The interpretation above eliminates this uncertainty and provides agencies with a more concrete understanding of the applicable requirements before they begin a review process.

Because the City was not obligated to perform a VMT analysis, we conclude its traffic findings are supported by substantial evidence. The traffic study prepared for the addendum found the Gemdale project would not significantly impact traffic. It concluded that "[b]ased on the results of [its] analysis, the [Gemdale] project can be implemented without impacting the design or operation of the surrounding roadway system. An evaluation of intersection LOS [(levels of service)] shows that the addition of [Gemdale] project traffic to the existing and future Short-Term Interim Year, Long-Range Interim Year, and Buildout approved and pending traffic volumes would not

20

significantly impact the study area intersections or roadways, according to the [City's] performance criteria." Petitioner has not identified any deficiencies in this study other than its lack of a VMT analysis, which was not required.

Petitioner also argues a VMT analysis was required because the 2010 PEIR assumed there would be no TDRs between zones and the project site was "fixed." The Gemdale project violates these assumptions, petitioner asserts, which constitutes a substantial change to the 2010 PEIR that requires further analysis. (Citing Guidelines, § 15162, subd. (a)(1).) This argument is unpersuasive. No substantial change to the 2010 PEIR occurred. The 2010 PEIR specifies that a "fixed" classification does not preclude a site from receiving TDRs. It allows such transfers subject to a traffic study. Likewise, the 2010 PEIR recognized development in the IBC could differ from the assumptions used. To account for this, it explained projects inconsistent with land use assumptions would "be reviewed in accordance with existing city polices and traffic study procedures to determine whether additional conditions of approval or environmental review [were] necessary." Here, per the 2010 PEIR, a traffic study was conducted, and it determined no further environmental review was necessary. The City was not required to perform a VMT analysis for the reasons above.

Finally, citing raw data numbers from the addendum, petitioner argues there is substantial evidence the Gemdale project will have a potential VMT impact. But this is not the question we face. Rather, we ask whether the record contains substantial evidence to support the City's finding that the Gemdale project will not cause significant traffic impacts. It does. So, we need not weigh conflicting evidence. (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova*, *supra*, 40 Cal.4th at p. 435.) Further, "'[i]t is settled that [an agency] is not required to conduct every requested test in order to satisfactorily analyze a potential impact, and "our courts have repeatedly emphasized that an EIR must demonstrate a good faith effort at full disclosure; it does not

21

require perfection, nor exhaustive analysis.""" (*Tiburon Open Space Committee v. County of Marin*, *supra*, 78 Cal.App.5th at p. 754.)

### 4. Greenhouse Gas Impacts

Next, petitioner argues there is insufficient evidence to support the City's findings that the Gemdale project's greenhouse gas emissions are consistent with the 2010 PEIR and will not have a significant environmental impact. We agree.

### a. Background

CEQA review of a project's greenhouse gas emissions is relatively new. Its origin dates back to the California Global Warming Solutions Act of 2006, commonly known as Assembly Bill No. 32 (2005-2006 Reg. Sess.; Stats. 2006, ch. 488, § 1) (Assem. Bill 32), which established state policy for reducing greenhouse gas emissions.[4] (*Center for Biological Diversity v. Department of Fish & Wildlife* (2015) 62 Cal.4th 204, 215-217.) Among other things, Assembly Bill 32 called for "reduction of such emissions to 1990 levels by the year 2020," and it tasked the California Air Resources Board (the Air Board) with regulating emissions. (*Center for Biological Diversity*, at p. 215.)

In 2008, the Air Board developed a "Scoping Plan" for reducing greenhouse gases. The plan "explained that '[r]educing greenhouse gas emissions to 1990 levels mean[t] cutting approximately 30 percent from business-as-usual emission levels projected for 2020, or about 15 percent from [2008's] levels.'" (*Center for Biological Diversity v. Department of Fish & Wildlife*, *supra*, 62 Cal.4th at p. 216.) Business-as-usual emission levels "assume[] no conservation or regulatory efforts beyond what was in place when the forecast was made," while factoring in projected population

---

[4] "'Greenhouse gas' or 'greenhouse gases' includes but is not limited to: carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons and sulfur hexafluoride." (Guidelines, § 15364.5.)

and economic growth. (*Ibid*.) They "'represent[s] the emissions that would be expected to occur in the absence of any [greenhouse gas] reductions actions.'" (*Ibid*.)

The Guidelines pertaining to greenhouse gas emissions were adopted in 2010. (*Center for Biological Diversity v. Department of Fish & Wildlife*, *supra*, 62 Cal.4th at pp. 216-217.) They require an agency to determine the significance of greenhouse gas emissions for a project. (Guidelines, § 15064.4, subd. (a).) In doing so, the "agency shall make a good-faith effort, based to the extent possible on scientific and factual data, to describe, calculate or estimate the amount of greenhouse gas emissions resulting from a project." (Guidelines, § 15064.4, subd. (a).)

However, courts have recognized that greenhouse gas emissions pose a different type of challenge than most other pollutants. "[B]ecause of the global scale of climate change, any one project's contribution is unlikely to be significant by itself. The challenge for CEQA purposes is to determine whether the impact of the project's emissions of greenhouse gases is *cumulatively* considerable, in the sense that 'the incremental effects of [the] individual project are considerable when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects.'" (*Center for Biological Diversity v. Department of Fish & Wildlife*, *supra*, 62 Cal.4th at p. 219.)

Due to this challenge, "'there is no iron-clad definition of "significance"'" for greenhouse gas emissions. (*Center for Biological Diversity v. Department of Fish & Wildlife*, *supra*, 62 Cal.4th at p. 221.) "[E]ach lead agency [has] broad discretion to determine significance thresholds," and the Guidelines do "not mandate any one particular method to address greenhouse gas emissions." (*McCann v. City of San Diego* (2021) 70 Cal.App.5th 51, 91.) Rather, the Guidelines provide more general direction: "[i]n determining the significance of a project's greenhouse gas emissions, the lead agency should focus its analysis on the reasonably foreseeable incremental contribution of the project's emissions to the effects of climate change. A project's incremental

23

contribution may be cumulatively considerable even if it appears relatively small compared to statewide, national or global emissions." (Guidelines, § 15064.4, subd. (b).)

The Guidelines also allow an agency to "analyze and mitigate the significant effects of greenhouse gas emissions at a programmatic level," such as through a program EIR. (Guidelines, § 15183.5, subd. (a).) Once an agency has adopted such a plan, it "may fulfill its duty under CEQA to consider the significance of an individual project's greenhouse gas emissions by analyzing whether the project is consistent with the broader plan. If a project is found to be consistent with the broad plan, that finding provides sufficient evidence for the agency to conclude the project has no significant impact due to greenhouse gas emissions." (*McCann v. City of San Diego*, *supra*, 70 Cal.App.5th at p. 92.)

### 1. *The 2010 PEIR's emissions plan*

The IBC's 2008 greenhouse gas emissions totaled 909,352 metric tons (MTons) per year, with 683,499 MTons attributable to transportation sources and 225,853 MTons to nontransportation sectors (residential, nonresidential, hotel, infrastructure, water, and solid waste).[5] Based on these figures, the 2010 PEIR established a significance threshold of net zero emissions under the Vision Plan. In other words, to be considered less than significant, the IBC's greenhouse gas emissions would remain equal or less than 909,352 MTons per year through full buildout post-2030.

To achieve this goal, the 2010 PEIR determined, "plans, programs, or policies (PPP) and project design features (PDF) would need to . . . attain a net zero increase in [greenhouse gas] emissions." It identified existing City, State, and Federal

---

[5] For comparison, California produced 492 million MTons of greenhouse gas emissions in 2004. At the time of the 2010 PEIR, the state's business-as-usual projection for 2020 was 596 million MTons. The Air Board's 2020 emissions limit was 427 million MTons for the State, which required an emissions reduction of 169 million MTons (roughly 30 percent of the business-as-usual projection).

24

PPPs, PDFs, and other programs (together, the mitigation measures) designed to reduce greenhouse gas emissions. It concluded the net zero emissions goal would be met if all the mitigation measures were implemented. Specifically, it found greenhouse gas emissions for the IBC at full buildout would total 750,522 MTons, which was 17 percent lower than the 909,352 MTons emitted in 2008. Based on these findings, the 2010 PEIR concluded the Vision Plan's impact to global climate change were "less than significant."

### 2. The Addendum's emissions analysis

The addendum concluded the Gemdale project's greenhouse gas emissions would be less than significant for two separate reasons. First, the Gemdale project's emissions would be consistent with the 2010 PEIR. Second, its emissions would comply with thresholds drafted by the South Coast Air Quality Management District (the District), which adopts and enforces rules in Orange County pertaining to state and federal air quality standards. (*American Coatings Assn. v. South Coast Air Quality Management Dist.* (2012) 54 Cal.4th 446, 452-453.) There is insufficient evidence to support the first conclusion, and the second is legally incorrect.

We begin with the City's conclusion that the Gemdale project's emissions are consistent with the 2010 PEIR. As explained in the addendum, the 2010 PEIR "determined that through implementation of all feasible [mitigation] measures . . . related to [greenhouse gas] reduction, the [Gemdale] project would achieve required [greenhouse gas] emission reductions and its quantitative emissions would be considered less than significant." The Gemdale project would implement all relevant measures, "therefore [its] impact with respect to [greenhouse gas] emissions would be consistent with the [2010 PEIR] and this impact would be less than significant. No new or more severe impacts associated with [greenhouse gas] emissions would occur, and the level of impact would not change from the level identified in the [2010 PEIR]. No new [mitigation measures] are required."

25

The City argues the Gemdale project is consistent with the 2010 PEIR because it incorporates all the mitigation measures. The mitigation measures are a *means* to achieve the 2010 PEIR's target of net zero emissions (909,352 MTons or less per year). But the incorporation of the mitigation measures alone does not constitute substantial evidence that the Gemdale project is consistent with this overall goal. Even with all applicable mitigation measures in place, the largescale nature of the Gemdale project could cause it to emit a disproportionate level of greenhouse gases. Combined with the emissions of current and future projects, particularly those requiring TDRs, the Gemdale project's emissions could render the 2010 PEIR's goal of net zero emissions unattainable. While the 2010 PEIR found implementation of all the mitigation measures would allow the IBC to achieve net zero emissions, it did not analyze the effects of TDRs on greenhouse gas emissions. Nor does the addendum examine whether the Gemdale project's emissions will allow the IBC to maintain net zero emissions at full buildout. Indeed, the addendum does not even state the amount of emissions the Gemdale project will produce.

Simply put, there is insufficient evidence in the record to support the City's finding that the Gemdale project's greenhouse gas emissions are consistent with the 2010 PEIR's target of net zero emissions. Rather, it is unclear what effect the Gemdale project will have on the IBC's ability to achieve net zero emissions. To demonstrate the Gemdale project is within the scope of the 2010 PEIR's emissions plan, the City must analyze the Gemdale project's emissions within the context of present and future development in the IBC. The analysis must show its emissions will not prevent the IBC from achieving its goal of net zero emissions at full buildout.

In response, the City contends the Gemdale project "does not change the overall development intensity allowed under the Vision Plan and contemplated in the [2010 EIR]. . . . Merely shifting development intensity between sites within the IBC does not result in a substantial increase in [greenhouse gas] emissions, given the nature of such

26

emissions." Two considerations are relevant to this argument: the *source* of greenhouse gas emissions and *total* greenhouse gas emissions. The specific source of emissions within the IBC is largely irrelevant since released greenhouse gases do not remain in the local area. (*Center for Biological Diversity v. Department of Fish & Wildlife*, *supra*, 62 Cal.4th at pp. 219-220.) However, the total amount of emissions caused by a project or projects within the IBC is potentially significant.

To illustrate, there would be no significant environmental effect if the City chose to build one project in the IBC that emits 2,000 MTons of greenhouse gases instead of two smaller projects that each would have emitted 1,000 MTons. The single project would have the same total emissions as the two smaller projects combined. The source of the 2,000 MTons of emissions would be irrelevant since they would spread beyond the IBC's borders regardless of whether they came from one source or two sources. (See *Center for Biological Diversity v. Department of Fish & Wildlife*, *supra*, 62 Cal.4th at pp. 219-220.) But there could be a significant environmental effect if the single project emitted 5,000 MTons. The total emissions of the single project would be two and a half times greater than the combined emissions of the two smaller projects. An analysis would be needed to determine whether the 5,000 MTons of emissions caused by the single project were still consistent with the 2010 PEIR's goal of net zero emissions.

It is unclear from the record whether TDRs simply shift the source of greenhouse gas emissions or may impact total emissions. If the TDR required for the Gemdale project merely shifted the source of greenhouse gas emissions, then the City's argument would likely be persuasive. But its argument appears to assume the TDR will not substantially increase *total* greenhouse gas emissions. That may be true. But we have not been cited anything in the record to support this assertion, which is beyond common knowledge. It is unclear what effect the required TDR would have on emissions for the Gemdale project and, in turn, for the IBC. While the 2010 PEIR allows TDRs, it did not study what effect they may have on the IBC's total greenhouse gas emissions and

whether they might interfere with the IBC's goal of net zero emissions. Nor does the addendum contain any project-specific analysis of this issue or of the Gemdale project's total emissions.

Further, the record contains evidence showing the Gemdale project's greenhouse gas emissions may have significant environmental effects. While the approved addendum did not discuss its total emissions, draft documents indicate the City performed a study that found the Gemdale project would emit 5,563 MTons of greenhouse gases per year. For context, the District has created a draft guidance document (the draft guidance) for analyzing greenhouse gas emissions under CEQA. The draft guidance creates a five-tier approach. A project is analyzed from the first to fifth tier in ascending order. If it meets the requirements of any tier, its greenhouse gas impact is considered less than significant and the review process stops. Tier 1 applies if a project is exempt from CEQA, while Tier 2 applies if the project is consistent with a qualifying local reduction plan. Tier 3 consists of screening values. For commercial land uses, Tier 3 establishes a default significance value of 1,400 MTons of greenhouse gas emissions per year. In other words, projects with emissions of 1,400 MTons or less per year are deemed to have less than significant environmental effects. The Gemdale Project's 5,563 MTons of emissions are four times the Tier 3 screening level.[6]

Indeed, an earlier of the addendum initially examined the Gemdale project's greenhouse gas emissions under Tier 3 of the draft guidance. That draft concluded, "[g]iven a large majority of the [Gemdale] project's long-term operational emissions [would be] associated with mobile source emissions that the project [could not]

---

[6] We note that a project with emissions greater than 1,400 MTons can be deemed to have less than significant effects under the draft guidance if it meets the Tier 4 or 5 thresholds. A project may qualify under Tier 4 if it (1) reduces business-as-usual emissions by a certain percentage; (2) implements Assembly Bill 32 Scoping Plan measures; or (3) achieves certain targets in 2020 and 2035 for applicable service populations. Tier 5 requires "mitigation offsets to achieve a target significance threshold." There is no argument that either Tier 4 or 5 applies here.

directly control, *it is highly unlikely any level of mitigation measures could reduce the project's annual operational emissions to a less-than-significant level*." (Italics added.) Due to these findings, the City appears to have abandoned the Tier 3 analysis and replaced it with the emissions analysis described above and below.[7]

To clarify, we do not rule that the City must analyze the Gemdale project's emissions using the District's draft guidance. We provide the Tier 3 screening level and cite the draft addendum analysis only to offer context for the Gemdale project's potential emissions. We also do not mean to suggest that the Gemdale project itself must have net zero emissions or meet a certain emissions standard. As explained above, the City and Gemdale need only show the Gemdale project is consistent with the 2010 PEIR. Rather, we cite the above evidence to underscore that it is unclear, given all the development that has occurred since 2010 and that will occur in the future, whether the IBC will be on track to attain net zero emissions if the Gemdale project is built.

We next proceed to the City's second finding. As an alternative to consistency with the 2010 PEIR, the addendum also found the Gemdale project's greenhouse gas emissions would be less than significant based on Tier 1 of the draft guidance because the project is exempt from CEQA. This finding overlaps with the second major issue raised in this appeal, which also focuses on whether the Gemdale project is exempt from CEQA. As we explain in the next section, the claimed exemption does not apply as a matter of law.

---

[7] Petitioner asserts the City's decision to remove the Tier 3 analysis from the addendum amounts to fraud. Nothing in the record convincingly shows the City's decision not to include this information in the addendum was made in bad faith.

*B. Class 32 Infill Exemption*

The City argues any deficiencies in the addendum are inconsequential because the Gemdale project is categorically exempt from CEQA. As such, the City maintains it was not obligated to perform any environmental review.[8] We disagree.

"Categorical exemptions are 'classes of projects' that the Secretary of the Natural Resources Agency, with the authorization of the Legislature, has determined are exempt because they do not have a significant effect on the environment." (*World Business Academy v. State Lands Com.* (2018) 24 Cal.App.5th 476, 490-491.) But there are also *exceptions* to categorical *exemptions*. A project is not categorically exempt from CEQA if an exception is found to apply. (*Id*. at p. 491.)

Here, the City relies on the Class 32 infill exemption, which typically applies to projects characterized as in-fill development. (Guidelines, § 15332.) We need not analyze its elements because we find the Gemdale project qualifies for an exception to this exemption. Thus, the Class 32 infill exemption would not apply even if all its elements were met. (*World Business Academy v. California State Lands Commission*, *supra*, 24 Cal.App.5th at pp. 490-491.)

Under Guidelines section 15300.2, subdivision (c), "[a] categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." Courts have found the unusual circumstances exception applies if two elements are met: (1) "'the project has some feature that distinguishes it from others in the exempt class, such as its size or location'" and (2) "there is 'a reasonable possibility of a significant

---

[8] The City's decision to prepare an addendum rather than declaring the Gemdale project exempt does not preclude it from asserting an exemption on appeal. (See, e.g., *Del Cerro Mobile Estates v. City of Placentia* (2011) 197 Cal.App.4th 173, 179-180 [agency's decision to prepare an EIR did not waive its right to invoke a CEQA exemption on appeal].)

effect [on the environment] due to that unusual circumstance.'" (*Respect Life South San Francisco v. City of South San Francisco* (2017) 15 Cal.App.5th 449, 456 (*Respect Life*).)

The two elements are reviewed under different standards of review. The first is reviewed for substantial evidence, while the second is examined under the fair argument standard. (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1114.) Under the latter standard, we "review[] the evidence to see if there is a fair argument of a reasonable possibility the project will have a significant effect on the environment. [Citation.] If there is substantial evidence of a reasonable possibility the project will have such an effect, the agency may not rely on the exemption even if there is evidence to the contrary." (*Protect Tustin Ranch v. City of Tustin* (2021) 70 Cal.App.5th 951, 962.) "The fair argument standard creates a low threshold favoring future environmental review and differs markedly from the deferential substantial evidence standard of review normally enjoyed by agencies." (*Citizens for a Sustainable Treasure Island*, *supra*, 227 Cal.App.4th at p. 1049.) The burden is on petitioner to "produc[e] evidence supporting an exception." (*Berkeley Hillside Preservation*, at p. 1105.)

Here, the City made no express findings regarding the unusual circumstances exception. But the City's invocation of the Class 32 infill exemption constitutes an implied finding that no exceptions exist. (See *Madrigal v. City of Huntington Beach* (2007) 147 Cal.App.4th 1375, 1386; *San Francisco Beautiful v. City and County of San Francisco* (2014) 226 Cal.App.4th 1012, 1022-1023.) When reviewing implied findings, "a court's ability to affirm is constrained." (*Respect Life*, *supra*, 15 Cal.App.5th at p. 458.) Since findings are implied, "we cannot say with certainty whether [the City] found against [petitioner] on the first element, the second element, or both." (*Id*. at pp. 457–458.) Due to this uncertainty, "a court cannot affirm an entity's implied determination that the unusual-circumstances exception is inapplicable by simply concluding that the record contains substantial evidence that the project involves no unusual circumstances." (*Id*. at p. 458.) "[S]uch an approach fails to

31

address the possibility that the entity thought there were unusual circumstances but concluded, under the second element, that these circumstances did not support a fair argument of a reasonable possibility of a significant environmental effect." (*Ibid*.)

"Instead, to affirm [the agency's] implied determination, the court must assume that the entity found that the project involved unusual circumstances and then conclude that the record contains no substantial evidence to support either (1) a finding that any unusual circumstances exist (for purposes of the first element) or (2) a fair argument of a reasonable possibility that any purported unusual circumstances identified by the petitioner will have a significant effect on the environment (for purposes of the second element)." (*Respect Life*, *supra*, 15 Cal.App.5th at p. 458.) We cannot affirm under either of these routes.

First, there is substantial evidence to support a finding that unusual circumstances exist. To begin, the Gemdale project is not a standalone project. It is part of the Vision Plan, which guides development in the IBC. We must evaluate the Gemdale project within this context. The project site is currently occupied by a two story, 69,780-square-foot building and surface parking lots. The Gemdale project would demolish the existing building and construct a 275,000-square-foot office complex, consisting of a five- and a six-story office building and a seven-story parking structure. As seen in the pictures above, the Gemdale project would tower over the neighboring buildings.

Further, the project site is in zone 420. Under the Vision Plan, zone 420 was only allocated 130,222 square feet of office space upon full buildout. As seen in the map below, the project site (No. 65) occupies only about a fifth of zone 420. Yet, the Gemdale project would more than double the amount of office space originally allocated to *all* of zone 420.



While the Vision Plan and 2010 PEIR allow TDRs, the TDR required for the Gemdale project would be the largest of the 29 approved TDRs in the history of the Vision Plan.  The Gemdale project required a TDR equivalent to 221,014 square feet of development intensity, nearly doubling the second largest transfer of 111,538 square feet. It also required the largest TDR by floor area ratio (FAR) in the history of the Vision Plan.[9]  The existing building on the project site has a 0.25 FAR.  The Gemdale project required a TDR of 1.03 FAR (the project site is 4.95 acres, i.e., 215,622 square feet, and the Gemdale project required a transfer of 221,014 square feet).  The second largest transfer in the Vision Plan's history was 0.85 FAR, and the third largest transfer was only 0.51 FAR.  Only three of the 29 approved TDRs in the Vision Plan's history were above 0.50 FAR, and most approved TDRs were below 0.20 FAR.  Given the size of the Gemdale project, the scale of the TDR that was required to make it possible, and the resulting density, there is sufficient evidence in the record to support a finding of unusual circumstances.  (See *Respect Life*, *supra*, 15 Cal.App.5th at p. 458.)

---

[9]  FAR measures the ratio between the gross floor area of a project to the lot size.  (*San Francisco Tomorrow v. City and County of San Francisco* (2014) 229 Cal.App.4th 498, 510.)

Next, we conclude there is a reasonable possibility the Gemdale project may have a significant impact on the environment. "A project may have a significant effect on the environment if it 'has the potential to degrade the quality of the environment, . . . or to achieve short-term, to the disadvantage of long-term, environmental goals'; is 'cumulatively considerable,' such that its incremental effects 'are considerable when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects'; or 'will cause substantial adverse effects on human beings, either directly or indirectly.'" (*World Business Academy v. California State Lands Commission*, *supra*, 24 Cal.App.5th at p. 498.) "Any significant effect must be attributable to unusual circumstances." (*Ibid*.)

As explained above, the District's draft guidance contains thresholds for analyzing greenhouse gas emissions under CEQA. While the draft guidance had not been finally approved when the addendum was drafted, the addendum acknowledges its validity: "the [draft guidance] provides substantial evidence supporting the approaches to significance of [greenhouse gas] emissions that can be considered by the lead agency in adopting its own threshold." As discussed, under Tier 3 of the draft guidance, commercial projects that emit 1,400 MTons of greenhouse gases or less per year are deemed to have less than significant effects. As the addendum explains, Tier 3 "is expected to be the primary tier by which the [District] will determine significance for projects where it is the lead agency." Under the draft guidance, projects with emissions above 1,400 MTons may only be found to have less than significant environmental effects if they meet the requirements of Tier 4 or 5.

Due to its size and density, the Gemdale project's estimated greenhouse gas emissions appear to greatly exceed the Tier 3 threshold. There is evidence showing the Gemdale project's annual emissions would total 5,563 MTons per year, nearly four times the level of significance under Tier 3. And we have not been cited anything in the record showing Tier 4 or Tier 5 might apply here.

34

Indeed, the City's consultants admitted in internal correspondence, "using the most current and acceptable methods and [the District's] thresholds (1,400 MT CO2e/yr for commercial projects), the [Gemdale] project would be considered SU [(significant unavoidable environmental impacts)] because the sheer contribution from mobile sources (which are not in the project's feasible mitigation range) would cause the exceedance." Likewise, a draft addendum contained an analysis of the Gemdale project under Tier 3. It found, "[g]iven a large majority of the project's long-term operational emissions are associated with mobile source emissions that the project cannot directly control, it is highly unlikely any level of mitigation measures could reduce the project's annual operational emissions to a less-than-significant level." Further, as set forth above, it is unclear whether the Gemdale project is consistent with the IBC's goal of net zero emissions.

Based on the above evidence, there is reasonable possibility the project will have a significant effect on the environment.


III

DISPOSITION

We affirm the judgment granting the petitioner's request for a writ of mandate. The City's approvals of the addendum, the Gemdale project, and the accompanying TDR are void. (§ 21168.9, subd. (a)(1).)

To be clear, we do not hold that the City must perform additional environmental review or prepare a new EIR or a negative declaration. Nor does our ruling require the City to evaluate the Gemdale project's greenhouse gas emissions under any specific approach. Our ruling is limited: the City erred in approving the addendum, the Gemdale project, and the required TDR because it incorrectly determined the Gemdale project's greenhouse gas emissions would have less than significant environmental effects. First, there is insufficient evidence to support the City's finding

35

that the Gemdale project's greenhouse gas emissions are consistent with the 2010 PEIR. It is unclear whether the IBC will be able to meet its goal of net zero emissions if the Gemdale project is built. This issue has not been examined in sufficient detail in either the 2010 PEIR, which did not analyze the effects of TDRs, or the addendum. Second, the City's determination that the Gemdale project meets the draft guidance's Tier 1 threshold is incorrect as a matter of law because the Class 32 infill exemption does not apply.

Finally, we express no opinion on the specific method the City should use to evaluate the significance of the Gemdale project's greenhouse gas emissions (e.g., consistency with the 2010 PEIR, the District's draft guidance, or some other metric). We leave it in City's discretion to choose an allowable method of analysis under CEQA. Petitioner is entitled to its costs on this appeal.


MOORE, ACTING P. J.

WE CONCUR:


GOETHALS, J.


DELANEY, J.